J-S09019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TYRONE SALTER, | |
| Appellant | No. 1017 WDA 2014 |

Appeal from the Judgment of Sentence June 16, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0009421-2012

BEFORE:  FORD ELLIOTT, P.J.E., BOWES, and ALLEN, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 05, 2015**

Tyrone Salter appeals from the judgment of sentence of two and one-half to five years incarceration followed by seven years probation, which was below the mitigated range of the sentencing guidelines.   Sentence was imposed after the trial court convicted Appellant of one count of possession of a controlled substance with intent to deliver and two counts of possession of a controlled substance.  We affirm.

Appellant's convictions are premised upon the following evidence adduced by the Commonwealth at Appellant's combined suppression hearing and nonjury trial and accepted as true by the trial court.  Sheriff's Detective Richard Manning testified as follows.   On March 28, 2012, a team of five men from one of two Criminal Fugitive Squads of the Allegheny County Sheriff's Office executed a bench warrant for Appellant's co-defendant, Bruce

Lucas, at 1350 Herman Street, Pittsburgh. Lucas was wanted for violating his probation on a robbery charge. The team consisted of Detective Manning, Detective Richard Venezia, Detective Richard Dwyer, Sergeant Clark,[1] and Detective Ron Stokes. Detective Stokes covered the rear of the address, Detectives Manning and Venezia went to the front door, and the two other detectives stayed in front of the house.

Normally, a member of the squad would announce that they were from the sheriff's office and present to execute a warrant, but, in this case, no announcement was made. Detective Manning explained that they dispensed with the warning because three to four cameras were pointed at the house to detect who was approaching it. In addition, a window to the left of the front door was opened, and Detective Manning "could smell a strong pungent odor of marijuana. It was a fresh marijuana smell, as we approached the door." N.T. Non-Jury Trial Transcript, 10/30/13, at 23. Finally, Lucas was wanted for violating probation in a felony case so the sheriffs anticipated that he might attempt to flee.

Detectives Manning and Venezia knocked loudly and immediately "heard a lot of movement within the address." *Id*. at 21. After they knocked a second time, a male voice asked, "Who is it." *Id*. at 26. Detectives Manning and Venezia responded, "Sheriff's Office with a warrant. Answer

_____

[1] Detective Manning did not provide Sergeant Clark's first name. N.T. Non-jury Trial Transcript, 10/30/13, at 18.

the door." *Id*. A few seconds later, Detective Manning heard a metallic sound as if someone "was racking a gun, very close to the front door." *Id*.

At that point, the detectives attempted to kick in the front door, but it was barricaded. They continued to announce that they were sheriffs with a warrant and wanted the door to be opened. The only response was the sound of "people running around within the residence." *Id*. at 27. Detective Stokes radioed Detective Manning that two males had just jumped from the back porch of the house and were scrambling down a steep hill in the back yard that led to Spring Garden Avenue. Detective Manning left his post at the front of the house and observed the two men fleeing down Spring Garden Avenue. Detective Manning articulated that, at that point, he concluded that the they were engaged in criminal activity.

Detectives Manning and Venezia entered a vehicle, went to find the two fleeing men, and "saw them both walking down Spring Garden Avenue." *Id*. at 33. The two people, Appellant and his other co-defendant Melvin Crew, matched "the individuals [who Detective Manning] saw going down the hill in their clothing" as well as a description that had been provided by Detective Stokes. *Id*. Appellant's clothing was in disarray, grass stained, and dirty, and he was not wearing shoes.

When Detective Venezia started to approach him, Appellant immediately started to run. Crew ceased his flight at that point and was handcuffed by Detective Manning. Another police officer immediately arrived

at the scene, and Detective Manning joined Detective Venezia in the chase. As he started to run, Detective Manning heard Detective Venezia yell, "He is coming back down to you." *Id*. at 38. Detective Manning then observed Appellant come towards him and attempt to scale a nearby fence. Detective Manning grabbed Appellant and handcuffed him.

Detective Venezia arrived at the scene shortly thereafter with a purple velvet bag used to package Crown Royal liquor. Detective Venezia testified that Appellant threw away the bag while the detective was pursuing him. N.T. Continued Suppression Hearing, 11/25/13, at 9. The bag contained 96.7 grams of cocaine and 6.65 grams of marijuana. Appellant was in possession of $2,928 while Crew had $2,053. Lucas was located inside 1350 Herman Street. There was a stipulation that the Commonwealth would have presented testimony that the cocaine was possessed with intent to deliver.

On appeal, Appellant presents the following contention, "Did the trial court err by failing to suppress evidence obtained following a warrantless search of a bag discarded by [Appellant] due to the unlawful coercive action of police, when [Appellant] was arrested without probable cause, and officers had opportunity to obtain a search warrant?" Appellant's brief at 3.

Herein, the suppression court concluded that Appellant abandoned the bag while the detectives were in the process of attempting to effectuate a valid investigatory detention supported by reasonable suspicion pursuit to

*Terry v. Ohio*, 392 U.S. 1 (1968). Initially, we outline our standard of review in this context:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Garibay*, 2014 WL 6910879, 2 (Pa.Super. 2014) (citation omitted).

Appellant's first position is that the detectives needed to secure a search warrant before they looked inside the bag to discover its contents.

> As a general principle, the Fourth Amendment requires that law officers obtain a warrant issued by a neutral magistrate before they intrude into a place of privacy. However, an exception to the warrant requirement exists when the property seized has been abandoned. In *Commonwealth v. Shoatz*, 469 Pa. 545, 366 A.2d 1216 (1976), our Supreme Court delineated the test employed to determine whether an abandonment has occurred:
>
> > Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged

> abandonment should be considered. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.

*Id.*, 469 Pa. at 553, 366 A.2d at 1220.

**Commonwealth v. Clark**, 746 A.2d 1128, 1133-34 (Pa.Super. 2000) (emphasis omitted). Thus, if Appellant discarded the bag in question, he relinquished his expectation of privacy in that item and cannot contest the validity of its search without a warrant.

Herein, Detective Venezia reported that while he was chasing Appellant, Appellant threw away the purple velvet Crown Royal bag and continued to flee. Therefore, he abandoned it. **Commonwealth v. Byrd**, 987 A.2d 786 (Pa.Super. 2009); **Commonwealth v. Riley**, 715 A.2d 1131 (Pa.Super. 1998). As Appellant did not retain a privacy interest in the item that he threw away, he cannot contest the validity of its search without a warrant.

Alternatively, Appellant claims that he was forced to abandon the bag due to unlawful police action when he was arrested without probable cause. If property is discarded as a result of unconstitutional police conduct, then a defendant retains the ability to object to its search. **Byrd**, **supra**. The record establishes that Appellant discarded the bag while he was being chased by Detective Venezia and before he was restrained by Detective

J-S09019-15

Manning. Hence, the causative factor in the abandonment was not Appellant's detention while was climbing the fence but his pursuit by Detective Venezia. *Id*. The suppression court viewed this police interaction as an attempt at an investigatory detention, and we concur with its assessment as well as its conclusion that the interaction was supported by reasonable suspicion.

> Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures. ***Commonwealth v. Smith***, 575 Pa. 203, 836 A.2d 5, 10 (2003) (citation omitted). Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. ***Id****.* (citations omitted). The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an "investigative detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause. ***Id****.* (citations omitted).

***Commonwealth v. Lyles***, 97 A.3d 298, 302 (Pa. 2014). When we examine which level of interaction has occurred, we "conduct an objective examination of the totality of the surrounding circumstances." ***Id***. (citation omitted). This test focuses "on whether the suspect has in some way been restrained by physical force or show of coercive authority." ***Id***. (citation omitted).

Herein, it is evident that, contrary to his position, Appellant was not in police custody while he was being chased by Detective Venezia. While his course of action was being dictated by the police, he had not been arrested.

Hence, we view the interaction, as did the suppression court, as an attempt at an investigatory detention.

We outlined the test utilized to determine whether police had reasonable suspicion to support an investigatory detention in *Commonwealth v. Carter*, 2014 WL 6756271, 3 (Pa.Super. 2014) (*en banc*) (footnote omitted):

> "The Fourth Amendment permits brief investigative stops when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California,* ––– U.S. ––––, –––, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014). It is axiomatic that to establish reasonable suspicion, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Unlike the other amendments pertaining to criminal proceedings, the Fourth Amendment is unique as it has standards built into its text, *i.e.,* reasonableness and probable cause. *See generally* U.S. Const. amend. IV. However, as the Supreme Court has long recognized, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is an exception to the textual standard of probable cause. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). A suppression court is required to "take into account the totality of the circumstances-the whole picture." *Navarette, supra*. When conducting a *Terry* analysis, it is incumbent on the suppression court to inquire, based on all of the circumstances known to the officer *ex ante,* whether an objective basis for the seizure was present. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

Herein, police had much more than an unparticularized hunch that Appellant was engaged in criminal activity. As reported by Detective Venezia, and accepted by the suppression court, the conclusion that Appellant should be investigated for possible criminal activity was premised

upon the following objective facts giving rise to reasonable suspicion: 1) the front door of the home was barricaded and its occupants would not open the door to permit the sheriffs to execute their warrant; 2) in order to evade police at the front door, Appellant jumped from a porch in the back, scrambled down a hill, and started to run away; and 3) there was a strong odor of raw marijuana emanating from the house which Appellant just fled. Based on all of the circumstances known to the detectives, they had an objective basis to investigate Appellant. Hence, we affirm the suppression court's conclusion that reasonable suspicion was present herein. Since the abandonment of the bag was not the result of illegal police conduct, Appellant's claim must fail.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/5/2015